United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 28, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-60214

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT G. VIRGIL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

Before BARKSDALE, STEWART, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Robert G. Virgil appeals his conviction and sentence for being a felon in possession of a firearm. We affirm his conviction and, due to a constitutional error, reverse and remand for resentencing.

## I. FACTS AND PROCEEDINGS

In February 2002, Robert G. Virgil was arrested on state drug charges. During the course of his arrest, state police found numerous firearms in Virgil's possession. The state declined to prosecute and, instead, asked the federal government to pursue charges. In March 2004, a federal grand jury indicted Virgil on firearm possession charges stemming from the 2002 arrest. On April

-1-

6, 2004, local police executed a federal arrest warrant at Virgil's residence.

More than ten officers participated in the execution of the arrest warrant, essentially surrounding Virgil's residence. Chief Ellis Stewart, of the Hazlehurst, Mississippi, police department, went to the back of the residence before the officers in front knocked on the door. Chief Stewart heard noises coming from inside the rear of the residence and alerted the officers in front. The officers in front knocked on the door, and Virgil answered. The officers immediately arrested Virgil at the threshold of his residence. From that vantage point, the officers noticed a rifle-type weapon in the room.[1] Aware of Chief Stewart's report of noises coming from the rear of the residence, the officers asked Virgil if anyone else was on the premises. Virgil responded that he did not know. The officers then made a protective sweep of the two-room residence to ensure nobody else was present. During the course of the protective sweep, the officers observed a shotgun leaning against the wall behind the front door where Virgil was arrested.[2]

In a pre-trial hearing, Virgil attempted to suppress the shotgun. At this hearing and during trial, Virgil was represented by counsel Omodare Jupiter. The district court found that the shotgun was in plain view during the protective sweep; therefore, the court refused to suppress the shotgun.

---

[1]The weapon was later determined to be a pellet gun. At the time the officers observed the weapon, it had a sock pulled over the barrel.

[2]While not part of the instant charges, the officers also found several other illegal or suspicious items, including a stolen handgun, about 18 grams of crack, about 117 grams of marijuana, various drug paraphernalia, and about $40,000 in cash. The district court excluded most of these items because the court found that the "protective sweep" went far beyond a search for individuals on the premises and that a search warrant would have been necessary in order to constitutionally admit the items into evidence. Therefore, the items were excluded, and the government dismissed all the associated counts of the indictment. Further, the government dismissed the indicted counts related to the 2002 arrest, and Virgil did not contest the validity of the 2004 arrest warrant, even though the 2002 charges on which it was based were dismissed.

The shotgun was admitted into evidence at trial. On November 15, 2004, a jury found Virgil guilty of the sole count of being a felon in possession of a firearm, under 18 U.S.C. § 922(g)(1).

Following trial, the district court set Virgil's sentencing hearing for February 18, 2005. Prior to the hearing, on February 7, the district judge received a handwritten letter from Virgil, requesting a new trial and obliquely expressing dissatisfaction with Jupiter's trial strategy.[3] Virgil, along with Jupiter, appeared at the sentencing hearing on February 18 when, for the first time, Virgil refused Jupiter's assistance and requested new counsel be appointed. When the district court asked Virgil why he no longer wanted Jupiter as counsel, Virgil claimed that Jupiter had forced a defense witness to perjure himself on the stand and that Jupiter otherwise "didn't represent me right" by failing, among other things, to timely move for a new trial.

The district court, believing Virgil was "trying to manipulate the court," denied Virgil's request for new counsel and made Virgil choose between Jupiter's assistance or appearing *pro se*. Given the two alternatives, Virgil chose to represent himself. The district court asked Jupiter to stand by should Virgil change his mind. The district court then asked Virgil if he had read the Pre-Sentence Report ("PSR"); Virgil said that he had not. In light of the number and detail of previously filed objections to the PSR, the district court believed that Virgil "misrepresented to me that he has not read the presentence report." Nonetheless, the district court continued the hearing until March 4, 2005, in order to give Virgil additional time to review the PSR, Jupiter's objections, and the

---

[3]Jupiter is barely mentioned in Virgil's February 7, 2005, letter: "Newly discovered evidence fruit of a poison tree, dirty agent and officers and judge in Copia[h] County and Hazlehurst Mississippi that is why casing was dismissal and evidence throw out, my lawyer did not bring this up in trial and about the plants of evidence by Agent Lisa Jackson." The district court treated this letter as a motion for a new trial and recorded it on the docket. Though not reflected on the docket, Virgil sent a letter to the district court on January 19, 2005, as well. The letter is not part of the record and its contents are otherwise unknown to this court.

addendum to the PSR that Virgil had received the day before the sentencing hearing.

On March 4, 2005, Virgil and Jupiter appeared at the second sentencing hearing. Virgil again refused Jupiter's assistance, and Jupiter remained as stand-by counsel. Virgil repeated his request for the assistance of other counsel; several times during the sentencing hearing, Virgil complained that he was not an attorney or that he needed an attorney (that is, an attorney other than Jupiter). At one point, when Jupiter attempted to answer a question posed by the district court, Virgil interrupted: "I don't want Omodare Jupiter to do nothing." After reviewing the PSR and sustaining two of the objections Jupiter had filed on Virgil's behalf, the district court found that the applicable guideline range was 77 to 96 months. The district court then sentenced Virgil to a term of 96 months, three years probation, and fines.

Virgil brings this appeal, contesting the validity of the district court's decisions to deny suppression of the shotgun and to allow him to proceed *pro se* without proper warnings.

## II. DISCUSSION

**A.     Motion to Suppress**

**(1)     Standard of Review**

In reviewing the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and conclusions of law de novo. *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005), *cert. denied*, 74 U.S.L.W. 3486 (U.S. Feb. 27, 2006) (No. 05-8920); *United States v. Phillips*, 382 F.3d 489, 494 (5th Cir. 2004). Findings of fact must be viewed in the light most favorable to the prevailing party below, here, the government. *Lopez-Moreno*, 420 F.3d at 429; *Phillips*, 382 F.3d at 494. The district court's determination that the factual circumstances provided reasonable suspicion is reviewed de novo. *Lopez-Moreno*, 420 F.3d at 430.

**(2) Applicable Law**

Police armed with an arrest warrant and probable cause to believe that a suspect is at his home have the right to enter the premises to arrest him. *See Payton v. New York*, 445 U.S. 573, 602–03 (1980); *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997). Any arrest may be accompanied by a search "incident to the arrest" of the immediate vicinity, limited to areas in which weapons might be found, regardless of probable cause or reasonable suspicion. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The immediate vicinity may include even closed closets and other spaces. *Id.* Further, aside from the search incident to arrest, police may conduct a protective sweep of the relevant premises, provided the police possess a reasonable suspicion, based on specific and articulable facts, that another person may be on the premises and pose a danger to the police. *Id.* at 334–36. Such a protective sweep "may be no more than 'a cursory inspection of those spaces where a person may be found'" and "may 'last[ ] no longer than is necessary to dispel the reasonable suspicion of danger' . . . [nor] longer than the police are justified in remaining on the premises." *United States v. Gould*, 364 F.3d 578, 587 (5th Cir.), *cert. denied*, 543 U.S. 955 (2004) (en banc) (quoting *Buie*, 494 U.S. at 1099). The protective sweep may even occur *after* the suspect is arrested. *Buie*, 494 U.S. at 334; *Gould*, 364 F.3d at 587.

Additionally, the plain view doctrine allows police to seize items without a search warrant. Such a warrantless seizure is permissible if: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had a lawful right of access to the item. *United States v. Buchanan*, 70 F.3d 818, 825–26 (5th Cir. 1995) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

**(3) Analysis**

Virgil argues that the protective sweep was not supported by reasonable suspicion. Alternatively, Virgil argues that even a valid protective sweep would not include the space behind the door where the shotgun was discovered. Virgil's arguments are unavailing.

**a.    Reasonable Suspicion**

The police went to Virgil's residence to arrest him on a firearm charge. They heard sounds coming from inside the *rear* of the residence; Virgil then opened the *front* door. When asked if anyone else was inside the residence, Virgil responded that he did not know. Additionally, standing in the doorway at the time of the arrest, police observed a rifle-type weapon inside the house. The officers, therefore, had a reasonable suspicion, based on specific and articulable facts, that both a firearm and another person might be at the residence, and had authority to perform a protective sweep to prevent harm to themselves.[4]

**b.    Plain View**

Aside from contesting the validity of the protective sweep, Virgil contends that the shotgun was not in plain view in an area the police had the authority to search. Essentially, Virgil argues that the police unreasonably looked behind his front door to see if someone was hiding behind it. Virgil's argument rests on the rule that the protective sweep be limited to a cursory inspection of spaces from which danger may lurk (*i.e.*, where a person can be hiding). Virgil alleges that a dresser stood immediately behind the door, and that the shotgun was leaning in the small space between the dresser and the wall; therefore, because the space was small, Virgil contends, nobody could have hidden there and the officers unreasonably looked in that space.

---

[4]Since the protective sweep was permissible, we need not determine whether the police could have entered the residence pursuant to a search incident to arrest.

Virgil's theory fails on many grounds. First, Virgil's allegation that the police moved the door to see if anyone was hiding behind it is not supported by the record. Rather, the testimony elicited both at the suppression hearing and at trial indicated that the police saw the gun in plain view, without even moving the door, only after sweeping the back room and then returning to the front room. Second, even taking Virgil's factual rendition on its face, the police would be unable to know if there was enough space behind the door in which a person could hide unless they actually looked behind the door. Third, photographs admitted into evidence clearly show a space large enough for a person to hide. *See United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) ("A seizure may be justified if the seized items were discovered during the course of a protective sweep while officers looked in places where an individual might be hiding.").

Therefore, the police lawfully entered the area where the gun was located; the gun was in plain view; the incriminating nature of the gun was "immediately apparent;" and the police had a lawful right of access to the gun. Accordingly, the district court did not err in finding that the gun should not be suppressed.

**B.      Sixth Amendment Right to Counsel**

**(1)      Standard of Review**

With respect to the district court permitting Virgil to represent himself at sentencing, we will uphold the district court only if Virgil's decision to proceed *pro se* was made knowingly and intelligently. *United States v. Joseph*, 333 F.3d 587, 589 (5th Cir. 2003). We review de novo whether Virgil's decision to represent himself was constitutionally permissible under the circumstances. *Id.*

**(2)      Applicable Law**

At sentencing, Virgil's reasons for refusing Jupiter's assistance were, explicitly, that Jupiter had forced his brother to perjure himself on the stand and, implicitly, that Jupiter had failed to follow Virgil's preferred trial strategy or otherwise to get all incriminating evidence suppressed. Whether the district court abused its discretion by refusing to appoint new counsel is not at issue, as Virgil does not brief that ground. Rather, Virgil's sole argument with respect to sentencing is that the district court's failure to enunciate any *Faretta* warnings requires this court to remand for resentencing. *See United States v. Davis*, 269 F.3d 514, 520 (5th Cir. 2001) ("The district court was not obliged to honor [the defendant]'s mid-trial request to represent himself. Once it determined to do so, however, it was required to warn [the defendant] of the perils and disadvantages of self-representation." (internal footnote omitted)).

A criminal defendant, by virtue of the Sixth Amendment, has the right to counsel at trial. *See* U.S. CONST. amend. VI. *See, e.g.*, *United States v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991). The right to counsel extends to the sentencing stage as forcefully as to the guilt phase. *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (citing *Taylor*, 933 F.2d at 312). Of course, a defendant is not entitled to a particular counsel, just a competent one. *See Richardson v. Lucas*, 741 F.2d 753, 756 (5th Cir. 1984) ("Although the sixth amendment's right to counsel in criminal cases is absolute, an accused's right to a particular counsel is not."); *McQueen v. Blackburn*, 755 F.2d 1174, 1178 (5th Cir. 1985) ("A defendant is entitled to counsel capable of rendering competent, meaningful assistance. . . . No defendant has a right to more."). The presence of a "standby counsel" is not enough to fulfill the Sixth Amendment requirement when a defendant requests counsel. *Davis*, 269 F.3d at 520 (citing *Taylor*, 933 F.2d at 312).

The optional right to counsel does not force a requirement of counsel on an unwilling criminal

defendant.  *Faretta v. California*, 422 U.S. 806, 819, 833–35 (1975).  However, a defendant may only relinquish his right to counsel knowingly and intelligently.  *Id.* at 835; *Davis*, 269 F.3d at 518 ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.") (internal quotation omitted).

The district courts are required to provide *Faretta* warnings to ensure that a waiver is valid. *Davis*, 269 F.3d at 518–19.  However, there is "no sacrosanct litany for warning defendants against waiving the right to counsel."  *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005) (citing *Davis*, 269 F.3d at 519).[5]  Because of the vast differences from case to case, and defendant to defendant, a district court must consider the totality-of-circumstances in determining whether a defendant has properly waived his right to counsel.  *Davis*, 269 F.3d at 518.  Among other factors, the district court is required to consider

> the defendant's age and education, and other background, experience, and conduct. The court must ensure that the waiver is not the result of coercion or mistreatment of the defendant, and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving.

*Id.* (quoting *United States v. Martin*, 790 F.2d 1215, 1218 (5th Cir. 1986)).  The district court must also consider "the stage of the proceedings and the setting in which the waiver is advanced." *McQueen*, 755 F.2d at 1177.  *Accord United States v. Salemo*, 61 F.3d 214, 219 (3d Cir. 1995) ("This distinction [between the guilt phase and the sentencing hearing] is clearly relevant to the

---

[5]In particular, there is no strict requirement to follow a certain procedure similar to that of the *Miranda* warnings or a FED. R. CRIM. P. 11 guilty plea colloquy.

content of the colloquy which the court must have with the defendant. It does not, however, eliminate the need for the district court to make an inquiry sufficient to support a finding that the waiver of counsel is voluntary, knowing and intelligent.").

To permit meaningful appellate review, the district court must ensure that any such consideration of the validity of a waiver appear on the record because "[t]he risk of an off the cuff exchange with the defendant is that the exchange may end up lacking a sufficient basis on which we can find" a valid waiver. *Jones*, 421 F.3d at 364.[6]

**(3)    *Faretta* Violation**

The government concedes that no *Faretta* colloquy took place. Indeed, it would be impossible for the government to contend otherwise, since the sentencing transcript clearly reflects that the government requested the court engage in such a colloquy, a request the court denied.[7] The

---

[6]A district court can receive further guidance on proper *Faretta* questioning from THE BENCHBOOK FOR U.S. DISTRICT COURT JUDGES, published and provided by the Federal Judicial Center, though this circuit has upheld waivers with far less extensive *Faretta* warnings than the ones referenced in that guide. *Jones*, 421 F.3d at 363–64 & n.3. *See also Davis*, 269 F.3d at 519 n.11.

[7]The transcript reflects the following exchange between the district court, the federal prosecutor ("Ms. Anderson"), and the defendant:

> THE COURT:      Ms. Anderson, do you have a comment to make?
>
> MS. ANDERSON:   Your Honor, my comment was to ask the court as a matter of precaution to advise the defendant of the risk of proceeding pro se so that he can make an informed decision here during this proceeding.
>
> THE COURT:      All right. I don't think I have to appoint an attorney at this stage under any circumstances to represent the man in sentencing. I think that that's a matter for the court and that he does not have to have an attorney. I may be wrong about that, Ms. Anderson. You may be right about so advising Mr. Virgil, but I think I'll do that. Do you think that he has to have an attorney at this stage of the proceedings?

transcript is void of any indication that the district court sought to apprise Virgil of the "perils and disadvantages of self-representation," which is the minimum required by *Davis* and *Faretta*, much less engaged in any of the broader warnings suggested by *Davis*.

Rather, the government rests its argument on the view that no formal *Faretta* colloquy is required or, alternatively, that any error was harmless. The government, in its brief, attempts to undertake the analysis *Davis* requires of the district court, noting aspects of and inferences from Virgil's age, education, and general competence. In this instance, the government cannot belatedly remedy the district court's error in failing to insure that Virgil knowingly and intelligently waived his rights, as required by our *Faretta* jurisprudence. Indeed, such a position on appeal is incongruous with that taken by the trial prosecutor, who recognized the district court's pitfall and requested the court advise Virgil of the dangers of self-representation. Regardless of whether a formal colloquy is mandated by *Faretta* or *Davis*, at a minimum the district court must ensure a defendant's waiver

---

| MS. ANDERSON: | No, sir. We're in agreement. If he doesn't want one, we just ask that he be advised. |
| THE COURT: | Mr. Virgil, Mr. Jupiter is here and available to help you. You have said you had a conflict with him and that you don't want him to help you. If you change your mind, he's here and available. He may - - |
| DEFENDANT: | I couldn't get another attorney's advice? |
| THE COURT: | Have you got the money to hire another attorney? |
| DEFENDANT: | No. |
| THE COURT: | I'm not going to appoint you another attorney just for sentencing. No. You're trying to manipulate the court, Mr. Virgil. I know exactly what you're doing. |

is valid, based on the factors previously described.  The district court took no steps to do so.[8]  Not

a sentence in the transcript reflects a belief, much less a finding, by the district court that Virgil was

validly waiving his right to counsel.

**(4)    Harmless Error Analysis**

In the event that we were to find a *Faretta* violation caused by a defective waiver, which we

now do, the government asked this court to find that any error by the district court was harmless.

The applicability of harmless error analysis for this type of *Faretta* error is an unsettled question in

this circuit.[9]  The majority of our failure-to-warn *Faretta* cases deal with error at trial, rather than at

sentencing, and virtually all of those cases reverse without ever entertaining the possibility of harmless

error.  *See, e.g.*, *Jones*, 421 F.3d at 365 (vacating without mentioning harmless error); *Davis*, 269

F.3d at 520 ("Because the trial court's warning against self-representation did not satisfy *Faretta*, [the

defendant]'s Sixth Amendment right to counsel was violated.  We therefore must vacate [the

defendant]'s conviction and remand for a new trial.").[10]  *Cf. Tucker*, 969 F.2d at 159 (reviewing a

claim of ineffective assistance of counsel at sentencing) ("'[A]ctual or constructive denial of the

assistance of counsel is legally presumed to result in prejudice.'") (quoting *Strickland v. Washington*,

466 U.S. 668, 692 (1984)); *Taylor*, 933 F.2d at 312 (reviewing a Sixth Amendment claim of denial

---

[8]Of course, the ultimate inquiry is not what the district court said but what the defendant knew and understood.  Without a waiver colloquy or any clear record evidence, we cannot conclude that Virgil's waiver was valid.

[9]Another type of *Faretta* error, wherein a district court *prevents* a defendant from proceeding *pro se*, is inherently prejudicial and, therefore, incapable of being reviewed for harmless error.  *See McCaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

[10]Importantly, in *Jones*, the government urged this court to apply harmless error analysis and affirm the defendant's conviction.  This court declined to do so, as is evidenced by the utter lack of attention the government's position received in the opinion.

of counsel at a sentencing hearing, though not a *Faretta* violation) ("[T]here is a great difference between having a bad lawyer and having no lawyer: . . . if the defendant had no lawyer, prejudice is legally presumed in every case, and the defendant is entitled to relief in every case.").

We have in one applicable, though less recent, case undertaken harmless error analysis and found an invalid waiver of counsel in the guilt phase of a trial harmless beyond a reasonable doubt. *See Richardson*, 741 F.2d at 757. However, we hold that *Richardson* is no longer precedent.

In *Richardson*, the court found the defendant's waiver of counsel constitutionally valid under *Faretta*. 741 F.2d at 757. Only as an alternative ground for affirming the defendant's conviction did the court say that any error was harmless. *Id.* Furthermore, *Richardson* cites only to a since-overruled Tenth Circuit case, *United States v. Gipson*, 693 F.2d 109, 112 (10th Cir. 1982), to support the applicability of harmless error analysis to *Faretta* violations. *See United States v. Allen*, 895 F.2d 1577, 1579–80 (10th Cir. 1990) (holding that recent Supreme Court precedent implicitly overruled *Gipson*). *Richardson* is further undercut by the holdings of every other circuit to consider the issue, all of which have concluded that harmless error analysis is inapplicable to failure-to-warn *Faretta* violations. *See Allen*, 895 F.2d at 1579–80; *Strozier v. Newsome*, 871 F.2d 995, 997 & n.3 (11th Cir. 1989); *United States v. Balough*, 820 F.2d 1485, 1490 (9th Cir. 1987); *United States v. Welty*, 674 F.2d 185, 194 n.6 (3d Cir. 1982).

In forming their own view, some of our sister circuits benefitted from Supreme Court guidance that was yet unavailable to our court in *Richardson*. In *Rose v. Clark*, 478 U.S. 570, 578 (1986), the Court recognized that harmless error analysis presupposes that the defendant was represented by counsel at trial. *See also Balough*, 820 F.2d at 1490 (relying on *Rose* to find harmless error analysis inapplicable to failure-to-warn *Faretta* error). In *Penson v. Ohio*, 488 U.S. 75, 88

(1988), the Court held harmless error analysis inapplicable when the defendant was left entirely without the assistance of counsel on appeal. *See also Allen*, 895 F.2d at 1579–80 (relying on *Penson* to find harmless error analysis inapplicable to failure-to-warn *Faretta* error). Even without further discussion, it is sufficiently clear that these Supreme Court decisions, among others, have abrogated our holding in *Richardson*. *See generally Cordova v. Baca*, 346 F.3d 924, 927–28 (9th Cir. 2003) (discussing *Richardson*'s instability after the Supreme Court's decisions in *Rose* and *Penson* and stating "We have every confidence that the Fifth Circuit will reconsider its position in *Richardson* when it next revisits the issue.").

To hold now, as our sister circuits have, that this type of *Faretta* error at *trial* is insusceptible to harmless error analysis is not necessarily to hold that the same error at *sentencing* could never be harmless. Recognizing the distinction, though, we see only imperfect ways of drawing a line between the two. When the Third Circuit considered the instant issue, a majority of the panel refused to apply harmless error analysis when reviewing a *Faretta* error at sentencing. *Salemo*, 61 F.3d at 222. Though he believed the error in *Salemo* to be harmful , then-Judge Alito, breaking with the majority, sought to limit future panels from interpreting *Salemo* as declaring a rule that such an error was prejudicial *per se*: "It may well be that these precedents [refusing to undertake harmless error analysis] should be *extended* to govern the deprivation of counsel at sentencing, but neither the Supreme Court nor this court has yet done so, and I think that such an extension would warrant [more] careful analysis [than provided by the majority]." *Salemo*, 61 F.3d at 223 (Alito, J., concurring). Judge Alito noted that "[s]uch a blanket rule could produce some strange results. For example, suppose that a defendant does not validly waive counsel at sentencing but is given the mandatory minimum sentence prescribed by statute." *Id.* at 223 n.1. Judge Alito's concerns are well

-14-

taken. We note, though, that sentencing has become more than just a rote exercise in delivering a term of years; it often entails probation, parole conditions, restitution, and other penalties. Furthermore, since the Sentencing Guidelines, even after *United States v. Booker*, 543 U.S. 220 (2005), play a considerable role in determining a defendant's punishment, it is important that a defendant fully understand "the dangers and disadvantages of self-representation," *Davis*, 269 F.3d at 518, before attempting to navigate the Guidelines' various potentialities on his own.

We conclude that harmless error review is inapposite here. If a court's error in denying counsel at trial, *see United States v. Cronic*, 466 U.S. 648, 659 (1984), and on appeal, *see Penson*, 488 U.S. at 88, cannot be rehabilitated with harmless error analysis, we fail to see how at sentencing this type of *Faretta* error, which is the functional equivalent of improperly proceeding without *any* counsel, can be reviewed for harmless error. Accordingly, we hold that *Faretta* violations of this type, even at the sentencing stage, are so fundamentally violative of due process that the error is harmful *per se*. Our holding today surely is not ground-breaking; rather, we merely clarify and explicitly state that which our precedent has long recognized.[11]

### III. CONCLUSION

We AFFIRM Virgil's conviction, as the district court did not err in failing to suppress the shotgun. However, we REMAND FOR RESENTENCING in light of the *Faretta* violation.

---

[11]We do not hold, however, that a defective waiver colloquy, as distinguished from a defective waiver, can never be subject to harmless error analysis. *See also Baca*, 346 F.3d at 927–28 (discussing the distinction between a defective waiver colloquy and a defective waiver). *Cf. Joseph*, 333 F.3d at 589 (5th Cir. 2003) (looking to the district court's colloquy and then supplementing it with facts from the record).