# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 29, 2013

Lyle W. Cayce
Clerk

No. 12-40245

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

FELIPE SALINAS,

Defendant–Appellant.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 2:11-CR-966-1

Before OWEN and HAYNES, Circuit Judges, and LEMELLE,[*] District Judge.

PER CURIAM:[**]

Felipe Salinas appeals his convictions for knowingly making a materially false statement to a deputy United States marshal in violation of 18 U.S.C. § 1001(a)(2) and for possession of more than 500 grams of a mixture or substance containing a detectable amount of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).  We affirm.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 12-40245

## I

Agents of the United States Marshal Service (USMS), led by Deputy Marshal Chris Askew, tracked the cell phone of a wanted fugitive, Antonio Ortiz, to an apartment complex in Corpus Christi, Texas. The agents followed the phone signal as it moved through the complex, and Askew observed a person he did not know, Felipe Salinas, walking in the location that was indicated as the phone's location. Wearing full tactical gear that conspicuously identified him as a USMS agent, Askew approached and confronted Salinas on the sidewalk with one other agent. Shortly after the conversation was initiated, one of the other agents in the area notified Askew through a radio earpiece that Ortiz's cell phone was in Askew's immediate vicinity. Askew told Salinas that the USMS was looking for a fugitive, showed him a picture of Ortiz, and asked if Salinas knew Ortiz. Initially, Salinas denied knowing Ortiz or having ever seen him.

Shortly thereafter, a cell phone in Salinas's possession began to ring. Salinas removed the phone from his pocket, which allowed Askew to see the incoming call's phone number on the screen. Askew immediately recognized the number as one that was frequently called from Ortiz's phone. Askew asked Salinas who was calling, and Salinas claimed the call was from his father's work number. At Askew's request, Salinas handed the phone to the officer for inspection, and at the same time, Salinas produced another phone from his pocket, which he also gave to Askew. When questioned, Salinas disclosed the phone number of the first phone but claimed not to know the number for the second phone. Salinas did, however, disclose the passcode for the second phone, which was locked.

Once Askew had unlocked the second phone, he was able to confirm that it was the phone that USMS had been tracking. Salinas initially claimed that he had purchased the phone himself and continued to deny knowing Ortiz. After further questioning, Salinas admitted that he knew Ortiz, but asserted that he

2

had not seen Ortiz in months. When Askew confronted Salinas with the fact that the second phone belonged to Ortiz, Salinas feigned surprise but then confessed that he was holding the phone at Ortiz's request because Ortiz was worried that the Government might track him through the phone. Salinas was then arrested by Officer Matt Harmon, a Corpus Christi police officer assigned to the USMS task force, on state charges for hindering apprehension of a fugitive.[1] The duration of the encounter between the time Askew approached Salinas and his arrest was approximately 15 to 20 minutes.[2] At some unspecified point after Salinas's arrest, agents read him his rights pursuant to *Miranda v. Arizona.*[3]

Once arrested, Salinas further divulged that he had been in recent contact with Ortiz and offered to show the agents the location of Ortiz's parents' house, where he believed they could find Ortiz. The agents asked Salinas to call Ortiz, which he did, but Salinas received no answer.

A federal grand jury indicted Salinas on September 28 on one count of making false statements to a deputy United States marshal. On October 11, a group of agents, including Askew and Harmon, executed an arrest warrant at Salinas's apartment. The agents knocked for several minutes before Salinas opened the door, and Askew presented him with the warrant. Askew asked whether there was anyone else in the apartment, and Salinas replied, "No, you can search it," and gestured inside. Both Askew and Harmon took that to mean

---

[1] It is not clear whether the state charges were ever prosecuted.

[2] There is some uncertainty about when Salinas was arrested and read his *Miranda* rights. Contradicting the district court's conclusion that Salinas was arrested at the apartment complex, Harmon testified that he arrested Salinas and read him his rights after Salinas lead the agents to Ortiz's parents' house. Because Salinas does not challenge the introduction of any statements made after the encounter on the apartment sidewalk, the precise moment of Salinas's arrest is immaterial.

[3] 384 U.S. 436 (1966).

Salinas was consenting to a full search of the apartment. The agents entered the apartment and handcuffed Salinas. Once inside, the agents saw a notebook containing names and dollar amounts that Askew recognized as a drug-transaction ledger; razor blades; white powder on a table and the floor that later field-tested positive for cocaine; and clothing and a duffel bag with the Ferrari symbol on them, which Askew knew was associated with Los Zetas—a violent gang known to deal drugs.[4] Askew opened the duffel bag and found what was later confirmed to be several hundred grams of cocaine. Pursuant to protocol, the agents then stopped the search and called the Drug Enforcement Agency (DEA). Officer Charles L. Bartels, a Corpus Christi police officer assigned to the DEA task force, and a second agent responded. Bartels presented Salinas with a written search-consent form, but Salinas refused to sign it. On the basis of the evidence already collected, the agents obtained a search warrant for Salinas's apartment. In the subsequent search, the agents discovered more cocaine in Salinas's bathroom closet. A total of 785.5 grams of cocaine was seized from the duffel bag and the closet.

The Government then secured a superseding indictment, charging Salinas with one count of making false statements and one count of possession of at least 500 grams of a mixture or substance containing a detectable amount of cocaine with the intent to distribute. Salinas filed a motion to suppress the statements he made to Askew during their first encounter at the apartment complex and a motion to suppress the evidence seized from his apartment. At the suppression hearing, the Government offered testimony from Askew, Harmon, and Bartels. Salinas also testified, contradicting the Government's version of the events. The court found Salinas's testimony unconvincing. Regarding the motion to suppress Salinas's statements at the apartment complex, the court concluded:

---

[4] This name was erroneously transcribed as "Losetas" in the suppression hearing.

No. 12-40245

> On August the 2nd I find that the Marshal testified that he showed pictures of Ortiz to the Defendant who denied knowing him and then a phone call came in on Ortiz's phone in the hand of the Defendant. The conversation ensued further where he changed his story. He was arrested within 15 minutes of the initial contact.

With regard to the search, the court ruled:

> On October the 11th the Marshals executed an arrest warrant. They conducted a protective search incident to a lawful arrest. They may have believed they had consent to do more, but I'm not sure that that's clear from the testimony. They exceeded that by looking in the duffel bag. However, they had enough with the cocaine in plain view, the razors, the drug log, to get the search warrant, come back and it was inevitable that they would have seen the cocaine in the bag, as they found the cocaine in the laundry. So that is all admissible.

At a stipulated bench trial, the court found Salinas guilty on both counts. On appeal, Salinas argues that the district court erred in denying his motions to suppress the incriminating statements and the evidence of cocaine.

## II

We review the factual findings supporting the denial of a motion to suppress evidence for clear error, and we review questions of law de novo.[5] "The clearly erroneous standard is particularly deferential where 'denial of the suppression motion is based on live oral testimony . . . because the judge had the opportunity to observe the demeanor of the witnesses.'"[6] Furthermore, under the clear error standard we review the evidence in the light most favorable to the prevailing party (the Government).[7] A factual finding is clearly erroneous only

---

[5] *United States v. Mata*, 517 F.3d 279, 284 (5th Cir. 2008).

[6] *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005)).

[7] *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009).

No. 12-40245

when it is unsupported by the evidence when considering the record as a whole.[8] Furthermore, we are not limited to considering only the district court's reasoning and "may affirm a district court's ruling on a motion to suppress on any basis established by the record."[9]

## III

Salinas argues that the incriminating statements he made to Askew were inadmissible evidence because he was in custody at the time and had not been apprised of his rights pursuant to *Miranda v. Arizona*.[10]   We disagree. Additionally, even if those statements should have been excluded, their admission was harmless error because the remaining evidence was sufficient to convict Salinas.

Salinas is correct that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" unless the defendant has been given the prophylactic warnings mandated by *Miranda*.[11] Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody."[12]   Salinas argues that he was in custody for the purposes of *Miranda* as soon as Askew had possession of his cell phone and suspected he was lying.

In the absence of a formal arrest, whether a person is "in custody" depends on how a reasonable person would perceive and respond to the situation.[13]   We

---

[8] *United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011).

[9] *Mata*, 517 F.3d at 284.

[10] 384 U.S. 436 (1966).

[11] *Miranda*, 384 U.S. at 444.

[12] *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997) (quoting *Illinois v. Perkins*, 496 U.S. 292, 296 (1990)) (emphasis and internal quotation marks omitted).

[13] *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) ("[T]he issue is whether the reasonable person in [the same] situation would have understood the situation to

focus on the objective circumstances of the questioning and not the subjective purpose or intention of the law enforcement officers.[14]  A brief, public stop for questioning does not generally rise to the level of a custodial interrogation, even if the questioning is intended to determine whether the defendant is complying with the law.[15]  The hallmark of a custodial interrogation is the coercive power of law enforcement, which the Supreme Court "has recognized . . . can be mental as well as physical."[16]  "A determination of whether a defendant is 'in custody' for *Miranda* purposes depends on the 'totality of circumstances.'"[17]

The basic test for what constitutes a custodial interrogation is whether "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[18]  In general, we have held that custodial interrogation requires some combination of isolation, restriction of movement, physical restraint, and coercive technique.  For example, in *United States v. Cavazos*,[19] we held that the hour-long questioning of a defendant who was roused from his bed by fourteen officers executing a search warrant, handcuffed, and separated from his family during questioning constituted a custodial interrogation.[20]

---

constitute a restraint on freedom to the degree the law associates with formal arrest.").

[14] *United States v. Bengivenga*, 845 F.2d 593, 596-97 (5th Cir. 1988) (en banc).

[15] *Id.*

[16] *Miranda*, 384 U.S. at 448.

[17] *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

[18] *Bengivenga*, 845 F.2d at 596.

[19] 668 F.3d 190 (5th Cir. 2012).

[20] *Cavazos*, 668 F.3d at 194.

In contrast, in *United States v. Bengivenga*[21] we held that the questioning of two women on a commercial bus at a fixed immigration checkpoint did not rise to the level of custodial interrogation.[22]  In that case, agents detected a strong odor of marijuana emanating from three checked bags and asked the women to step off the bus for further questioning in the checkpoint trailer.[23]  The questioning officer quickly determined that the bags belonged to the two women based on luggage tags in their possession, and he arrested them and advised them of their constitutional rights.[24]  Noting that the questioning was brief and not overbearing (lasting only a few minutes), was not in isolation, and did not involve a large number of agents, the court concluded that "a reasonable person in Bengivenga's position would have understood that so long as the bus driver remained in the trailer the bus would not depart and if everything checked out she would shortly rejoin the other passengers on the bus."[25]

More recently, in *United States v. Chavira*,[26] we examined when questioning that is initially noncustodial becomes a custodial interrogation.  In that case, immigration officers first detained Chavira at an established pedestrian border checkpoint.[27]  When they grew suspicious of her claims that the minor teenage girl accompanying her was her daughter, immigration officials moved Chavira to a small, windowless room in the "secondary processing area" where she was subjected to a pat-down search, seated and

---

[21] 845 F.2d 593 (5th Cir. 1988) (en banc).

[22] *Bengivenga*, 845 F.2d at 594.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 599-600.

[26] 614 F.3d 127 (5th Cir. 2010).

[27] *Chavira*, 614 F.3d at 129.

No. 12-40245

handcuffed to a chair, and questioned by several officers about her statements.[28] We held that although Chavira was not free to leave, the initial checkpoint detention did not constitute a custodial interrogation.[29]  However, the questioning in the secondary processing area did.[30]  We noted that, in addition to moving Chavira to a small, enclosed space away from the public, immigration officials had confiscated Chavira's birth certificate and driver's license, separately detained the minor child accompanying her, physically restrained her with handcuffs, and questioned her for 30 to 40 minutes in an "increasingly accusatory" manner.[31]

The circumstances of Salinas's initial encounter with law enforcement at the apartment complex do not indicate that it was a custodial interrogation. Salinas was not moved to a separate location or physically restrained.  He remained subject to public scrutiny and was questioned by only two agents. Unlike *Chavira* and *Cavazos*, the agents did not restrict or control Salinas's actions beyond asking him questions.  Although, post hoc, Salinas claims that he perceived himself to be in custody, a reasonable person would not have considered himself to be under arrest in those circumstances.[32]

---

[28] *Id.* at 129-30.

[29] *Id.* at 133.

[30] *Id.*

[31] *Id.* at 134.

[32] *See United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (recognizing that the "essential" inquiry is whether "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave" (citing *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011))); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc) ("The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.").

Salinas concedes that the encounter did not begin as a custodial interrogation, but argues that two circumstances moved the encounter into the realm of a custodial interrogation: that Askew took possession of his cell phones and became suspicious that he was lying. Relying on *Florida v. Royer*,[33] Salinas argues that retention of a key item of property is a "show of official authority such that 'a reasonable person would have believed that he was not free to leave.'"[34] However, at issue in *Royer* was whether the defendant was "seized" for the purposes of an illegal search and seizure under the Fourth Amendment.[35] We have repeatedly recognized that seizure under the Fourth Amendment is distinct from custody under *Miranda*.[36] "The critical difference between the two concepts . . . is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest."[37] Although the retention of the phones, like the retention of the identifying documents in *Chavira*, is some evidence that the encounter was custodial, it is insufficient for us to conclude that the district court clearly erred in finding that Salinas was not in custody.

The only other evidence Salinas offers is Askew's testimony that he suspected Salinas was lying and that "at that point [Salinas] was not free to leave." Under *Bengivenga*, the focus of the officer's questioning is not probative of custody.[38] Nor does temporary detention by itself automatically rise to the

---

[33] 460 U.S. 491 (1983).

[34] *Royer*, 460 U.S. at 502 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of STEWART, J.)).

[35] *Id.* at 499-500.

[36] *E.g.*, *Cavazos*, 668 F.3d at 193 ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment." (citing *Bengivenga*, 845 F.2d at 598)).

[37] *Bengivenga*, 845 F.2d at 598.

[38] *Id.* at 597.

level of custodial interrogation.[39]  Even if Salinas were not "free to leave," that does not mean that he was effectively under arrest for the purposes of *Miranda*.

In the alternative, assuming that Salinas's statements were obtained in violation of *Miranda* and were therefore inadmissible, admission of the incriminating statements was harmless error.  To demonstrate harmless error in this context, the Government must show that the evidence, absent the improperly admitted evidence, overwhelmingly demonstrates beyond a reasonable doubt that Salinas knowingly made a materially false statement.[40] We conclude that it has met this burden.

Salinas sought to exclude three specific statements:  that he knew Ortiz, that he had spoken with Ortiz recently, and that he was holding Ortiz's phone to help Ortiz avoid capture.  He argues that, without those three statements, the Government could not prove beyond a reasonable doubt that Salinas knowingly made a materially false statement to Askew when Salinas said he did not know Ortiz.

To convict Salinas under 18 U.S.C. § 1001, the Government had the burden to prove that Salinas "(1) made a statement (2) that was false (3) and material (4) knowingly and willfully and (5) that falls within agency jurisdiction."[41]  Each element of the crime is either directly proven or is an inescapable inference from the admissible evidence that Salinas possessed Ortiz's cell phone and received a phone call on his personal phone from a number associated with Ortiz—all while denying any knowledge of or connection to Ortiz.  Salinas's statement that he did not know Ortiz was shown to be false by

---

[39] *Id.* at 597-98; *see also United States v. Chavira*, 614 F.3d 127, 129, 133 (5th Cir. 2010).

[40] *United States v. Virgen-Moreno*, 265 F.3d 276, 294 (5th Cir. 2001) (citing *United States v. Paul*, 142 F.3d 836, 843 (5th Cir. 1998)).

[41] *United States v. Jara-Favela*, 686 F.3d 289, 301 (5th Cir. 2012).

No. 12-40245

Salinas's possession of Ortiz's phone and knowledge of the passcode. The sole plausible inference for Salinas's denial that he knew Ortiz is an intent to deceive.[42] Salinas made a statement that, if believed, would frustrate the apprehension of a fugitive, making it material to the USMS investigation.[43] For the same reason, the statement was relevant to the jurisdiction of the USMS. The statements that Salinas asserts were obtained in violation of *Miranda* were cumulative and their admission, if in error, was harmless.[44]

---

[42] *United States v. Guzman*, 781 F.2d 428, 431 (5th Cir. 1986) ("The requirement that the false representation be made 'knowingly and willfully' is satisfied if the defendant acts deliberately and with the knowledge that the representation is false.").

[43] *United States v. Moore*, 708 F.3d 639, 649 (5th Cir. 2013) ("A material statement is one that has 'a natural tendency to influence, or be capable of influencing, the decision of a decisionmaking body to which it was addressed.'" (quoting *United States v. Richardson*, 676 F.3d 491, 505 (5th Cir. 2012))).

[44] The following exchange during the suppression hearing among the district court, Askew, and the prosecutor, Ms. Hampton, suggests that the court too considered the statements made by Salinas merely cumulative evidence:

> THE COURT: Well, how early in the process did you figure out that was Mr. Ortiz's phone?
> THE WITNESS: Within—within a couple minutes.
> THE COURT: A couple minutes?
> THE WITNESS: Yes, ma'am.
> THE COURT: Okay. So nothing you found out after that—I mean, is there anything of any import to suppress after that?
> MS. HAMPTON: Yes, your Honor. There's statements by the Defendant after that, when he's not in custody, before the 15 minutes that he's talking—they're still trying to find out where Mr. Ortiz is at, is that correct?
> THE WITNESS: That's correct.
> MS. HAMPTON: And they know—
> THE COURT: Well, he said he didn't know who this person was.
> MS. HAMPTON: That's correct, your Honor.
> THE COURT: And that you later found out within two minutes that he had the phone. So what more is there ever to suppress?
> MS. HAMPTON: After that he admits to knowing Mr. Ortiz and admits—
> THE COURT: Well, they knew that. He had his phone.
> MS. HAMPTON: And admits that he had switched phones with Mr. Ortiz.
> THE COURT: Of course he did. He had the phone. He said, "I didn't know him."
> MS. HAMPTON: It's just those admissions, your Honor.
> THE COURT: I don't know what difference it makes, really.

12

No. 12-40245

## IV

Salinas's second issue concerns the district court's denial of his motion to suppress the evidence of cocaine seized at his apartment. He argues that because the agents had no authority to search the Ferrari duffel bag, the cocaine found in the bag is inadmissible. Without the cocaine from the duffel bag, Salinas asserts that the agents did not have probable cause for a search warrant and therefore would not have discovered the quantity of cocaine in his bathroom closet. We disagree. Even assuming that the agents' search of the duffel bag violated the Fourth Amendment, the evidence seized in plain view was sufficient to support a search warrant. As a result, all 785 grams of cocaine inevitably would have been discovered, and the exclusionary rule does not apply.

The Fourth Amendment protects "against unreasonable searches and seizures,"[45] and the search of a home without a warrant is presumptively unreasonable.[46] The exclusionary rule prohibits the Government from introducing evidence obtained directly or indirectly as result of an illegal search.[47] However, the exclusionary rule is inapplicable if the otherwise suppressible evidence would inevitably have been discovered by lawful means.[48] Evidence is inevitably discoverable if "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a

---

[45] U.S. CONST. amend. IV.

[46] *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

[47] *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (quoting *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)).

[48] *Id.*

substantial alternate line of investigation at the time of the constitutional violation."[49] In this case, both elements are satisfied.

With regard to the second element, the agents' presence for the purpose of executing a valid arrest warrant demonstrates active pursuit of an alternate line of investigation.[50] Indeed, we have suggested that the second element of the inevitable discovery rule may be superfluous.[51]

The first element is satisfied in the present case because the legally obtained evidence was sufficient to support probable cause for the search warrant that ultimately issued.[52] In his affidavit in support of the application for a search warrant, Bartels provided the following details: (1) an account of his knowledge and experience in drug enforcement, particularly with regard to facts and circumstances that are indicative of drug dealing; (2) an account of Askew's initial encounter with Salinas leading to the conclusion that Salinas was associated with Ortiz, a known drug dealer; (3) an attestation as to Askew's belief, based on his own knowledge and experience, that Salinas was involved in the distribution of illegal narcotics; and (4) a description of items found in Salinas's apartment during his arrest, including the drug ledger, pill bottles, razor blades, several cell phones, the duffel bag with the Ferrari emblem, and cocaine residue on the kitchen floor. The affidavit contained more than enough evidence to provide probable cause for a search warrant, and Salinas's contention that the agents would not have obtained a search warrant without

---

[49] *Id.* (citing *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991)).

[50] *Id.* at 242 ("[A]n ongoing grand jury investigation that has already led to an indictment would clearly satisfy [the second element].").

[51] *Id.* (citing *Lamas*, 930 F.2d at 1104).

[52] *Id.* ("Once seized, this evidence could not only be introduced at trial but also used as evidence of probable cause in support of a warrant." (citing *United States v. Webster*, 750 F.2d 307, 328 (5th Cir. 1984))).

evidence of the quantity of cocaine found inside the Ferrari duffel bag is unconvincing.[53] Even assuming that the cocaine in the duffel bag was obtained from an illegal search, a reasonable basis for probable cause is evident.[54] As a result, there is a reasonable probability that the cocaine in the duffel bag inevitably would have been discovered legally.

We also reject Salinas's suggestion that the agents had no right to be in his apartment at all and that therefore none of the supporting evidence was legally obtained. The record demonstrates that the agents' presence was justified for at least three reasons. First, the arrest warrant alone provided a legal basis for entry into the apartment.[55] Second, pursuant to an arrest, law enforcement agents are permitted to perform a "protective sweep" search of the area within immediate control of an arrestee and areas immediately adjacent to the place of arrest "from which a surprise attack could occur."[56] Finally, the record

---

[53] *See United States v. Adcock*, 756 F.2d 346, 347 (5th Cir. 1985) (per curiam) ("Probable cause [for a search warrant] is that which warrants a man of reasonable caution in believing that there is a 'practical, non-technical' probability that contraband is present on the premises to be searched; it does not demand a showing that the belief is more likely true than false.").

[54] *See Jackson*, 596 F.3d at 241 (reasoning that probable cause existed for a subsequent search warrant as soon as the police found a single bag of marijuana during their protective sweep); *United States v. Monroy*, 614 F.2d 61, 63-64 (5th Cir. 1980) (holding that probable cause for a wider search existed when officers detected the odor of marijuana); *see also United States v. Hill*, 500 F.2d 315, 317 (5th Cir. 1974) ("Probable cause is deemed to exist where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." (quoting *United States v. Melancon*, 462 F.2d 82, 89 (5th Cir. 1972)) (internal quotation marks omitted)).

[55] *Jackson*, 596 F.3d at 241; *see also Payton v. New York*, 445 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").

[56] *United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008); *see also United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) ("Any arrest may be accompanied by a search 'incident to the arrest' of the immediate vicinity, limited to areas in which weapons might be found, regardless of probable cause or reasonable suspicion.").

No. 12-40245

demonstrates that Salinas invited the agents into his apartment. Salinas concedes that he consented to entry but argues that his consent was not voluntary.[57] Salinas has waived this argument by failing to raise it in the district court.[58] Furthermore, although there is some disagreement about the scope of the invitation, it is plain that at the very least Salinas consented to the officers' entrance. Thus, the agents had ample legal grounds for being present inside the apartment, where the other evidence was in plain view.

Law enforcement agents may, in certain circumstances, legally seize evidence that is out in the open without a warrant or separate justification to search.[59] Under the plain view doctrine, any evidence was legally obtained if "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item."[60] All four prongs are satisfied in this case.

Whether the agents were inside the apartment at Salinas's invitation, to conduct a protective sweep, or simply to execute the arrest, they were lawfully present in the room, satisfying the first prong.[61] Evidence was visible without

---

[57] *See United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) ("In order to satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority.").

[58] *See United States v. Pope*, 467 F.3d 912, 919-20 (5th Cir. 2006). Salinas argued below that the exchange with Askew never took place and that he had not given any consent.

[59] *See Jackson*, 596 F.3d at 241-42 (recognizing that the plain view doctrine is an independent exception to the search warrant requirement if the police are lawfully present by virtue of an arrest warrant and that it does not require that the officers be conducting a protective sweep).

[60] *United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (quoting *United States v. Buchanan*, 70 F.3d 818, 825-26 (5th Cir. 1995)).

[61] *See Moore v. Felger*, 19 F.3d 1054, 1058 (5th Cir. 1994) ("Agents who have a lawful right of access to an area do not have to look the other way if they discover evidence of criminal conduct not specified in a search warrant. That is the central principle of the plain

any intrusive search, satisfying the second prong. The third prong is satisfied as well; both Askew and Bartels indicated that the visible items, in their experience, were indicative of drug trafficking. Finally, the fourth prong collapses with the first in this case because the legal justification for the agents' presence in Salinas's apartment puts them in the position to have legal access to the evidence.[62]

In sum, assuming *arguendo* the cocaine seized from the duffel bag and closet during the initial search of Salinas's apartment was seized illegally, it was admissible under the inevitable discovery doctrine, and therefore the district court did not err in denying Salinas's second motion to suppress.

* * *

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

view doctrine.") (internal citation omitted).

[62] *See United States v. Paige*, 136 F.3d 1012, 1024 (5th Cir. 1998) (noting that the fourth factor "is [ordinarily] implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance. In those cases, the officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises." (alteration in original) (quoting *United States v. Naugle*, 997 F.2d 819, 823 (10th Cir. 1993)) (internal quotation marks omitted)).