# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 4, 2010

No. 08-51308

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ELIZABETH CHAVIRA

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, STEWART, and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

On March 26, 2008, Elizabeth Chavira, a United States citizen, attempted to enter the United States from Mexico at the Paso del Norte Port of Entry in El Paso, Texas. A minor teenage girl, P.L.D., accompanied Chavira. Customs officers took them to a passport control secondary processing area and questioned Chavira for thirty to forty minutes while she was hand-cuffed to a chair. Chavira appeals her conviction under 18 U.S.C. § 1001(a) for knowingly and willfully making a false statement to a Customs and Border Protection officer that P.L.D. was her daughter and a United States citizen, when she knew P.L.D. was in fact neither her daughter nor a United States citizen. Chavira argues that the district court erred in denying her motion to suppress

No. 08-51308

statements made at secondary processing for the failure to give warnings pursuant to *Miranda v. Arizona*, 86 S. Ct. 1602 (1966). For the reasons set out below, we vacate her conviction and remand for a new trial.

## BACKGROUND

When she applied for entry into the United States at pedestrian primary, Chavira provided her own California birth certificate and Texas identification to Customs and Border Protection Officer Ramirez. Chavira also provided a Texas birth certificate for P.L.D. and told the Customs officer that the minor was her daughter. She was unable to provide any identification for P.L.D. Chavira told Officer Ramirez that she was in a hurry because she had a flight to catch.

Suspicious of Chavira's claims, Officer Ramirez took Chavira and P.L.D. to secondary processing. The secondary processing areawas, at the time, a windowless mobile home trailer located about a ten-second walk away from the primary pedestrian entry booths, where Chavira and the minor had applied for entry into the United States. The then secondary processing area (used during construction of a permanent secondary facility) was a secure area, not accessible to the public, and surrounded by a ten-foot chain-link fence. When Officer Ramirez brought Chavira and P.L.D. to the secondary processing trailer, Customs and Border Protection Officers Ortiz and Fierro were already inside the trailer. Officer Ramirez returned to primary processing after telling the two officers that he suspected that Chavira made a false claim regarding the minor's citizenship.

Customs officers separated Chavira and the minor. P.L.D. was taken to an adjacent room while Chavira remained in the first room of the trailer.[1] The

---

[1] There is a factual dispute as to whether the door between the two rooms was open or closed. The officers on the record below testified that the door was open the entire time and Chavira could hear the officers question the minor as they went back and forth between questioning Chavira and the minor. Chavira testified that the officers went back to question the minor three or four times and they closed the door behind them each time. The district

first room was "14 by 10 foot . . . a real small area." The officers called for two female officers to conduct a pat-down search of Chavira within five to ten minutes of bringing her into the secondary processing trailer. After patting Chavira down, she was told to sit in a chair at a desk. The officers handcuffed her left hand to the chair. According to Officer Ortiz, this was policy in case they needed her to write or sign anything with the other hand. Chavira testified that the officers told her that the handcuffs were for officer safety. One of the officers informed her that she was being detained for questioning and began questioning her. Specifically, they asked Chavira:

> "[q]uestions that pertain to the evidence that's in front of us, whether it's a birth certificate, whether it's an ID, or any kind of document that might be—normally we ask, you know, 'Where were you born? How many kids do you have? Can you name your father's date of birth, where they were born.'"

The officers learned that Chavira had five other children and this was the first time Chavira had crossed the border with P.L.D. In fact, the officers had seen Chavira cross the border multiple times, but this was the first time they witnessed her attempt to cross with the minor. Officer Fierro followed up with questions about the ages, genders, and names of Chavira's other children. Then, the officers asked the minor similar questions in the next room. The officers repeatedly asked P.L.D. about the relationship between herself and Chavira, but P.L.D. was non-responsive to the officers' questions. When Officer Fierro asked the minor whether she had any brothers or sisters, the minor told him that she could not remember. Then, she confessed that her actual mother is a friend of Chavira's and that Chavira was doing her mother a favor by attempting to take her to Dallas, Texas. Based on this confession from the minor, Officers Ortiz and Fierro suspected that Chavira had committed a crime.

---

court found the door remained open.

No. 08-51308

After learning that the minor was not actually Chavira's daughter, Officers Ortiz and Fierro returned to questioning Chavira. They told Chavira that, "We know [P.L.D.] is not your daughter," and that "[s]he told us you were not her mother." They demanded Chavira "[t]ell [them] the truth." "[W]ithin a couple of seconds, she stated that 'I'm doing a friend a favor . . . and she is not my child. She is not an American or a United States citizen.'"[2] As soon as Chavira confessed, the officers immediately read her her *Miranda* rights. She then requested an attorney, and there is no evidence that she said anything else after the *Miranda* warnings.[3]

In total, the officers questioned Chavira for thirty to forty minutes.[4] Officer Ortiz later admitted that during this time Chavira was not free to leave.[5]

---

[2] The sequence of these events is also disputed. The officers describe the sequence as set out above. Chavira testified that Officer Fierro called her father after talking to P.L.D., talked to him about Chavira's children, and then accused her of not telling the truth. Officer Fierro testifed that he called her father after giving Chavira *Miranda* warnings, and only to determine what should be done with the luggage that Chavira had.

[3] She signed a form acknowledging she had been advised of her rights. The form also had a separate signature blank following the printed statement that she was willing to answer questions; she did not sign that blank; in that blank Officer Fierro filled in the statement "requested an attorney."

[4] The details of precisely how long Chavira was questioned are not clear. For example, Officer Fierro testified that Chavira was sitting in the chair subject to questioning for thirty minutes. The waiver of *Miranda* rights form reads:
> "8. Time interview began  _1830 hrs_  [handwritten] 9. Time subject or suspect advised of right to remain silent and fact any statement could be used against him in court and name of officer furnishing advice  _CBPO E Ortiz 1905 hrs_  [handwritten]"

Officer Ortiz testified that Chavira spent thirty-five minutes in secondary processing. Chavira testified that the officers questioned her for forty or fifty minutes. The district court resolved the conflicting testimony by making a factual finding that questioning lasted thirty to forty minutes.

[5] In fact, there is some evidence that she was not free to leave after her birth certificate had been taken and it was decided to take her to secondary processing. Officer Ramirez, with whom she applied for entry, testified on cross examination:
> "Q. Okay. And you testified that you asked her, 'Please follow me.'

4

No. 08-51308

Officer Ortiz admitted on cross examination that he did not advise Chavira of her rights because he wanted her to confess to the crime first; that his purpose was to get her to make incriminating statements.

As noted, the Government charged Chavira with violating 18 U.S.C. § 1001(a) by knowingly and willfully making a materially false, fictitious or fraudulent statement or representation to a Customs and Border Protection Officer.[6]  Chavira filed a motion to suppress the statements she made to the

---

A.  Yes, ma'am.

Q. Now, at that moment, was Ms. Chavira free to decline that invitation?

A. Did she decline the invitation?

Q. No. Was she -- was she free to say, 'Ah, that's okay. I don't want to follow you'?

A. Yes, uh-huh.

Q. She was?

A. Yes.

Q. If she -- didn't you still have a copy of the birth certificate that she had given you?

A. I had it with me.

Q. Yeah. So you are telling the Court that you asked her to follow you for further inspection, but yet she was free to decline your invitation.

A. Up to a certain point, they are.

Q. What if she had left? What would you have done?

A. Detained her."

[6] Section 1001(a) reads:
(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

　　　　(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

　　　　(2) makes any materially false, fictitious, or fraudulent statement or representation; or

　　　　(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent

No. 08-51308

Customs and Border Protection Officers in secondary based on the failure to administer *Miranda* warnings.  After an evidentiary hearing, the district court denied Chavira's motion to suppress.  The trial court set the case for a bench trial based on stipulated facts.  The parties stipulated:

1.    Ms. Elizabeth Chavira is a citizen of the United States.

2.    On March 26, 2008, Ms. Chavira applied for entry into the United States from Mexico at the Paso Del Norte Port of Entry pedestrian primary lane.

3.    Accompanying Ms. Chavira was a minor female (PLD).

4.    Ms. Chavira said PLD was her daughter and presented on her behalf as proof of her relation, a Texas birth certificate in the name of [G.E.D].

5.    The Primary Customs and Border Protection Officer (CBPO) requested a picture ID from minor PLD and Ms. Chavira said she did not have one because her (PLD's) school does not issue picture Ids.

6.    The Primary CBPO asked Ms. Chavira if PLD spoke English. Ms. Chavira said no because minor PLD had lived in Mexico all her life.

7.    The Primary CBPO suspected Ms. Chavira had made a false claim regarding minor PLD and referred both of them to secondary passport control inspection (PCS).

8.    At the PCS inspection, Ms. Chavira admitted she was not the mother of minor PLD; minor PLD was not a U.S. citizen; she was doing minor PLD's mother a favor by attempting to bring her (minor PLD) to the United States; and the Texas birth certificate she presented at primary inspection on behalf of minor PLD belonged to her real U.S. citizen daughter who's [sic] true name appeared on the birth certificate.

---

statement or entry;

shall be fined under this title [or] imprisoned not more than 5 years . . .

18 U.S.C. § 1001(a).

6

9.     The minor PLD is in fact a native and citizen of Mexico without any legal documentation to enter the United States and she was denied admission by the Primary CBPO.

The Government presented no other evidence at the bench trial beyond the stipulated facts. The district court made findings of fact that were identical to the stipulated facts above. Relying on these facts, the trial court determined that Chavira was guilty of violating section 1001(a)(2) of Title 18. The court sentenced her to three years probation, 100 hours of community service and parenting classes.

## DISCUSSION

The issue before this court is whether Chavira's Fifth Amendment rights were violated when customs officers questioned her at secondary processing without first giving her the warnings required under *Miranda v. Arizona*, 86 S. Ct. 1602 (1966). The Government must administer *Miranda* warnings before custodial interrogations.[7] *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc). Generally speaking, *Miranda* describes a custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *Miranda*, 86 S. Ct. at 1612. The ultimate inquiry is whether there is a formal arrest or a restraint on freedom of movement of a degree associated with formal arrest. *Bengivenga*, 845 F.2d at 596. The Court examines how the reasonable man in the suspect's position would have understood the situation. *Id.* Specifically, "[t]he reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the

---

[7] Assuming the facts found by the trial court are not clearly erroneous, we review this issue *de novo*, as a matter of law. *United States v. Harrell*, 894 F.2d 120, 122–23 (5th Cir. 1990).

circumstances." *Id.* The subjective intent of neither the officer nor the defendant is relevant to the custody determination. *Id.* at 597. Chavira does not argue that she was under formal arrest; therefore, the issue is whether the reasonable person in Chavira's situation would have understood the situation to constitute a restraint on freedom to the degree the law associates with formal arrest.

### A. *The Reasonable Man Test*

In *Bengivenga*, the en banc panel determined that routine citizenship checks at fixed checkpoints are characteristic of ordinary traffic stops, and not the type of "stationhouse interrogation" that renders a person in custody. *Bengivenga*, 845 F.2d at 598. In that case, the court compared the type of custody associated with criminal investigation to the average immigration questioning. *See id.* Routine immigration questioning involves a brief detention and questioning limited in scope to the relevant issue of entry. *See id.* at 598–99. We are aware of no law requiring customs officers to allow admission if the applicant refuses to answer these routine questions or produce relevant documents to show entitlement to admission. *See id.*; *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996). As in *Bengivenga*, the questioning at the primary processing here did not amount to custodial interrogation. The questioning at the primary pedestrian entry involved a brief detention and the production of relevant documents. *Bengivenga*, 845 F.2d at 598. It was a fixed checkpoint and the stop and questioning should not have surprised the reasonable person. *See id.* at 599. It was brief and subject to the scrutiny of other travelers. *Id.*

The situation changed when Officer Ramirez took Chavira to secondary processing. Considering all the circumstances here, we hold that Chavira was subjected to custodial interrogation at secondary processing when she made the statements referenced in paragraph 8 of the stipulation. First, well before the

officers elicited those statements from Chavira, the officers had already made the determination that P.L.D. was not Chavira's child. There was no reasonable immigration related purpose behind further questioning other than to elicit incriminating statements for potential prosecution. Crucially, the case changed from a routine immigration case to an essentially criminal law enforcement case. Thus, Officer Ortiz testified that *after* the officers realized that Chavira was not P.L.D.'s mother and P.L.D. was not a United States citizen, they accused Chavira of being untruthful *but* "did not advise her [Chavira] of her rights because she hadn't made a confession to the crime" and they "were trying to get her to make incriminating statements."[8]

A reasonable person in Chavira's situation would have realized that the officers were asking something more than routine immigration questions. Chavira had crossed at this particular border multiple times. Officer Ramirez, the agent at primary pedestrian entry, testified that he was familiar with Chavira because she crossed so frequently. Presumably, this incident was the first time Officer Ramirez had referred Chavira to secondary. Further, officers asked questions unrelated to her entry: the names, ages and number of her children. They told Chavira that they knew she was not telling the truth and to confess. These facts suggest to the reasonable person in Chavira's situation that

---

[8] The Government argues in its brief that even if Chavira was in custody, no interrogation occurred. It is for the above reason, however, that we find Chavira was subjected to custodial *interrogation*. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 100 S. Ct. 1682, 1689–90 (1980). *This is not the type of routine booking question* contemplated by *Pennsylvania v. Muniz*, 110 S. Ct. 2638, 2650 (1990). When the subject of the questioning transformed from routine questioning about immigration to questions calculated and intended to elicit a criminally incriminating response, the officers began *interrogating* Chavira for purposes of *Miranda*. *See Innis*, 100 S. Ct. at 1690 n.7 (the intent of the police is relevant and may have bearing on whether the police should have known their words were reasonably likely to evoke an incriminating response).

something more than routine immigration questioning was occurring and so such a person likely would feel constrained. *See United States v. Ozuna*, 170 F.3d 654, 659 (6th Cir. 1999) (relying on the fact that the questioning remained limited in scope to immigration to hold the defendant was not in custody). Additionally, there was evidence that Chavira was in actuality not free to leave. Officer Ramirez testified that once he had referred her to secondary, had she attempted to leave, he would have detained her.

Second, Chavira's freedom of movement was severely restrained to the degree a reasonable person would associate with arrest. Chavira's birth certificate and Texas identification were both confiscated. Had she wanted to leave, she would have to first retrieve her belongings from the Government. Likewise, the minor in her care, P.L.D., was also detained. Had Chavira wanted to leave, she would either have had to leave P.L.D. or try to convince the Government to release her. What's more, Chavira was searched and then handcuffed to a chair in a windowless fourteen by ten foot room, in a secured area not accessible to the public. *See United States v. Harrell*, 894 F.2d 120, 125 (5th Cir. 1990) (identifying the lack of physical restraints comparable to formal arrest as a factor in holding the defendant was not subject to custodial interrogation). Under all these circumstances, thirty to forty minutes of increasingly accusatory questioning would indicate to the reasonable person in Chavira's situation that her freedom had been restrained to the degree associated with formal arrest. *See Bengivenga*, 845 F.2d at 600 (Bengivenga's detention at checkpoint lasted ninety seconds).

**B. Comparison to Existing Case Law**

The *Bengivenga* court examined four factors in its analysis of custodial interrogation at secondary processing:

> "First, the trailer was only a short distance from the bus. Second, the conduct of the agents remained subject to the public scrutiny to the extent that the bus driver was actually present in the trailer

No. 08-51308

drinking coffee. The agents did not completely isolate the women in an interrogation room. Third, the number of agents did not increase. Only five people were present in the trailer—the bus driver, the two women and the two agents. Changing the locus of the questioning to the trailer had the advantage of eliminating the potentially embarrassing presence of other bus passengers. With Agent Santana preoccupied with completing a baggage receipt form for the bus driver, it was unlikely that the agents might team up to overbear Bengivenga's will. Finally, a reasonable person in Bengivenga's position would have understood that so long as the bus driver remained in the trailer the bus would not depart and if everything checked out she would shortly rejoin the other passengers on the bus."

*Id.* at 599–600. In Chavira's case, the trailer was a thirty-second walk from primary pedestrian processing. However, the questioning occurred in a windowless, secured area that was not accessible to the public. The purpose of a need for a public setting was explained in *Bengivenga*. Interrogations in public settings are less police dominated than stationhouse interrogations; the public nature reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate. *Id.* at 598. Handcuffed to a chair in a windowless trailer, Chavira was in a police dominated setting. The trial record reflects that anywhere from two to four agents questioned Chavira. Separating Chavira and the minor, questioning them in separate rooms, comparing answers and confronting Chavira with the minor's answers and accusing Chavira of being untruthful, all while deliberately withholding *Miranda* warnings because she had not yet confessed to a crime, bear the hallmarks of traditional custodial interrogation that *Bengivenga* lacked.

We have addressed the *Bengivenga* factors in *United States v. Harrell*. 894 F.2d 120, 123–24 (5th Cir. 1990). There, the defendant was taken to a secondary processing room that was separated from the public by glass enclosures. *Id.* at 124. While he was questioned for over an hour, he was not accused of any crime

11

No. 08-51308

so as to heighten apprehension. *Id.* The evidence used against him was elicited a few moments into the questioning. *Id.* This court narrowly held that "investigatorial questioning by agents during those first few minutes at the immigration checkpoint [cannot] be fairly described as a 'custodial interrogation.'" *Id.* This case does not present the same "advance notice, public scrutiny, and limited intrusion" that the *Harrell* court based its holding on. *Id.* Whereas the defendant in *Harrell* had advance notice of a brief checkpoint stop, Chavira did not have notice of a detention that would result in her handcuffed to a chair for half an hour. Whereas the questioning in *Harrell* took place behind a glass wall subject to public scrutiny, Chavira was interrogated in a fourteen by ten foot windowless room in the presence of only Government agents. Whereas those "first few minutes" resulted in limited intrusion, Chavira was the focus of intense questioning for thirty or forty minutes before she confessed, warning being deliberately withheld to elicit that confession.[9] *Id.*

## CONCLUSION

The trial court erred by denying Chavira's motion to suppress her statements elicited by the Customs and Border Patrol at secondary processing. Of course, the trial court's error is subject to the harmless error doctrine. *Harrell*, 894 F.2d at 123. We recognize that the stipulation – wholly apart from anything contained in its paragraph 8 and without consideration of anything stated by Chavira at the secondary inspection – might be sufficient to sustain her conviction. However, the problem is that the district court, as the trier of fact, *expressly relied* on the entire stipulation, *including* the statements recited in paragraph 8 which we hold inadmissible under *Miranda* (and nothing said by

---

[9] A panel of this court addressed a similar situation in the unpublished case *United States v. Delgado-Arroyo*, 358 F. App'x 530 (5th Cir. 2009) (per curiam). In that case though, the panel found it unnecessary to decide whether statements elicited without *Miranda* warnings were the product of custodial interrogation because the defendant's second, warned confession was voluntary. *Id.* at 533.

No. 08-51308

the trial court indicates it likely would have convicted absent the facts stated in paragraph 8 of the stipulation).  We are therefore constrained to hold that the error was prejudicial.

The denial of the defendant's motion to suppress statements elicited without *Miranda* warnings is REVERSED, the trial court's judgments of guilt and sentence are VACATED, and this case is REMANDED for a new trial.

REVERSED and REMANDED.