# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2020

No. 19-50725

Lyle W. Cayce
Clerk

Consolidated with 20-50395

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

MODESTO GONZALEZ III, also known as Tres,

Defendant–Appellant.

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:18-CR-64-1

Before BARKSDALE, HAYNES, and WILLETT, Circuit Judges.

PER CURIAM:*

Modesto Gonzalez III appeals his convictions for wire fraud and unlawful possession of a firearm by a felon. Specifically, Gonzalez argues that his statements to law enforcement officers were obtained illegally and should have been suppressed. We disagree and affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-50725

I

In January 2018, state and federal agents executed a federal search warrant at Gonzalez's home. The warrant authorized officers to seize evidence of Gonzalez's two suspected crimes: (1) defrauding illegal aliens by falsely claiming to be a federal agent capable of providing immigration assistance in exchange for substantial payments, and (2) illegally possessing firearms and ammunition as a felon.

Prior to executing the search warrant, the agents discussed their approach. They planned to knock on Gonzalez's door and wait for a response rather than use force to enter. DEA Agent Piekenbrock, who was responsible for the impersonation investigation, told the other agents that he "was going to try to interview [Gonzalez], but that was obviously no guarantee." Piekenbrock did not intend to provide Gonzalez with a *Miranda* warning before such an interview because he did not plan to arrest him that day.

Around 7:10 a.m., "between eight and ten" agents arrived at Gonzalez's home to execute the warrant. Their clothing identified them as law enforcement, but they were not wearing tactical clothing and did not have their weapons drawn.

Piekenbrock, accompanied by other agents, knocked on the front door. Gonzalez answered. After a brief discussion with the agents, he stepped onto the porch. Gonzalez was "upset" and "immediately agitated." He loudly said, "[l]et's get going and let's just get this over with," that the agents were "going to get [his] family killed," that the agents should "take [him], and . . . go," used profanity, and appeared to be "about to start a fight." The agents, by contrast, maintained a "[m]easured" and calm tone.

The agents told Gonzalez that they came to execute a search warrant—not an arrest warrant. But Gonzalez was still agitated. Due to his "aggressive behavior," agents handcuffed Gonzalez and temporarily seated him on a chair

2

on the porch. Soon thereafter, agents moved Gonzalez to a chair next to the stairs leading to the front door of his home to reduce crowding near the doorway. Piekenbrock informed Gonzalez that he was not under arrest at that time. Gonzalez's stepfather, who was not handcuffed or otherwise restrained, sat next to him on another chair.

About fifteen minutes after Gonzalez was seated next to the stairs, a supervisor informed Gonzalez that if he remained seated and calm, the handcuffs would be removed. And then they were. Gonzalez had been handcuffed for about twenty minutes. He remained seated near the stairs while his home was searched. During the search, agents recovered, among other things, a loaded revolver from Gonzalez's bedroom and two shotguns that had been mounted on the living room wall.

About thirty to forty minutes after the handcuffs were removed, Piekenbrock and two other agents asked Gonzalez if he would be willing to speak with them. Gonzalez agreed. So, the agents and Gonzalez walked about forty feet to Piekenbrock's vehicle to talk. Piekenbrock sat in the driver's seat, Gonzalez sat in the front passenger seat, and the other two agents sat in the back seat. Piekenbrock did not lock the doors. He turned the vehicle and its heater on but partially opened the vehicle's windows. During their conversation, the agents' tone remained "[m]easured," and "very professional." And the agents never drew their weapons.

Initially, Piekenbrock reminded Gonzalez that he was not under arrest and that they only had a search warrant. Then Piekenbrock questioned Gonzalez regarding his impersonation scheme. Gonzalez admitted that he had committed "fraud" by taking hundreds of thousands of dollars from illegal aliens after falsely promising to get their immigration status adjusted, though he framed his actions as "something similar to a loan." During this roughly

thirty-five-minute discussion, Gonzalez volunteered information without being prompted to do so. He also consented to a search of his cell phone.

Next, Agent Flores of the Bureau of Alcohol, Tobacco, Firearms and Explosives—who was in the back seat of the vehicle—questioned Gonzalez about the shotguns and revolver recovered from his home. Gonzalez admitted that he had mounted those shotguns on his living room walls and that his fingerprints would likely be found on them. Plus, Gonzalez admitted that he had bought the loaded revolver from a member of the Aryan Brotherhood.

At this point, about forty minutes into the interview, Piekenbrock "stopped the interview" because Gonzalez's admission about the revolver "changed things" and could result in Gonzalez's arrest that day. So Piekenbrock provided him *Miranda* warnings. Gonzalez did not request a lawyer. Instead, Gonzalez acknowledged that he understood his rights, waived them, and agreed to continue the questioning. This post-*Miranda* interview lasted less than fifteen minutes. Gonzalez repeated his statements about the impersonation scheme and the recovered firearms. The agents never confronted Gonzalez with his pre-warning statements. At no point during the pre- or post-warning interview did Gonzalez ask to stop the questioning, to leave the vehicle, or for an attorney. And agents repeatedly told Gonzalez that he was not under arrest.

In response to Gonzalez's post-warning statements, Flores called an Assistant U.S. Attorney for legal advice regarding how to proceed and whether to arrest Gonzalez for being a felon in possession of a firearm. It was agreed that Gonzalez would be criminally charged with illegal firearms possession. So, Flores explained to Gonzalez that he would be arrested. Then Gonzalez was removed from the vehicle, handcuffed, and returned to the vehicle for transport to jail.

No. 19-50725

A grand jury charged Gonzalez in a one-count indictment with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). Gonzalez moved to suppress all his statements, arguing that the agents had intentionally conducted a prohibited, two-step interrogation to avoid *Miranda*'s requirements. The district court held a hearing at which both Piekenbrock and Flores testified. Following this hearing, the district court denied Gonzalez's motion to suppress. The court concluded that (1) Gonzalez was not in *Miranda* custody when the pre-*Miranda* interview occurred; (2) the agents had not deliberately employed a two-step strategy to undermine the warning; and (3) Gonzalez's statements were voluntary.

After the denial of his motion to suppress, Gonzalez entered into a conditional plea agreement with the Government. Gonzalez pled guilty to the felon-in-possession charge, and he waived his right to an indictment and pled guilty to an information charging wire fraud, in violation of 18 U.S.C. § 1343. He was sentenced to 120 months' imprisonment. Under the plea agreement, Gonzalez reserved the right to appeal the judgment for the limited purpose of securing appellate review of the district court's denial of his motion to suppress. Gonzalez timely appealed.

II

"In an appeal from a district court's ruling on a motion to suppress, this Court reviews factual findings in support of the ruling under the clearly erroneous standard and legal conclusions *de novo*." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012). "Our review is particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Lim*, 897 F.3d 673, 685 (5th Cir. 2018) (cleaned up). "The evidence is viewed in the light most favorable to the party who prevailed in the district court." *Cavazos*, 668 F.3d at 193. In this case, that party is the Government.

"The question of whether *Miranda*'s guarantees have been impermissibly denied to a criminal defendant, assuming the facts as established by the trial court are not clearly erroneous, is a matter of constitutional law, meriting *de novo* review." *United States v. Harrell*, 894 F.2d 120, 122–23 (5th Cir. 1990); *see also, e.g., United States v. Chavira*, 614 F.3d 127, 132 n.7 (5th Cir. 2010).

## III

Gonzalez argues that the district court erred in refusing to suppress the statements he made (1) prior to receiving *Miranda* warnings (because he claims the agents conducted a custodial interrogation without giving him *Miranda* warnings), and (2) after receiving *Miranda* warnings (because he claims the agents acted deliberately to circumvent the protections of *Miranda* by conducting a prohibited, two-step interrogation).

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc). But *Miranda* warnings are not required if an interrogation is non-custodial. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); *United States v. Garcia*, 77 F.3d 857, 859 (5th Cir. 1996). Gonzalez argues that he was in *Miranda* custody when agents initially interviewed him. But after reviewing "[t]he totality of the circumstances surrounding Gonzalez's interview," the district court determined that he was not in *Miranda* custody when he made his unwarned statements. We find no error in this conclusion.

To determine whether someone not formally arrested was in *Miranda* custody, we must first "ascertain whether, in light of the objective circumstances of the interrogation," *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal quotation marks omitted), "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (internal quotation marks

omitted). In other words, we must determine whether "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Bengivenga*, 845 F.2d at 596. "The reasonable person through whom [a court is to] view the situation must be neutral to the environment and to the purposes of the investigation . . . ." *Id.*

"[W]hen analyzing whether an individual was or was not in custody," we have "repeatedly considered certain key details," such as (1) "the location of the questioning," (2) "the amount of restraint on the individual's physical movement," (3) any "statements made by officers regarding the individual's freedom to move or leave," (4) "the accusatory, or non-accusatory, nature of the questioning," and (5) "the length of the questioning." *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (collecting cases).

If the court concludes that "an individual's freedom of movement" was so "curtailed," then it must "ask[] the additional question whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

A

Here, the district court did not err by first concluding that a reasonable person in Gonzalez's position would not have understood the circumstances in which he was interviewed to be a restraint on his or her freedom of movement to the degree associated with a formal arrest.

Turning first to the location of the questioning, Gonzalez was interviewed in an agent's vehicle, as was the defendant in *Wright*. *See* 777 F.3d at 777. Gonzalez sat in the front seat of the vehicle, not the back seat where arrestees usually sit. The interview occurred on Gonzalez's property and within forty feet of his home rather than a secondary, off-site location. Gonzalez could see and be seen by his family—meaning the vehicle was subject

to "public scrutiny." *See id.* Thus, the location of the interview suggests that a reasonable person in Gonzalez's position would not have understood the situation to constitute a restraint on freedom of movement equivalent to formal arrest. *See id.* at 771, 777 (concluding that defendant was not in custody where, while executing a search warrant, two officers interviewed him in a police vehicle about thirty feet from his home, defendant sat in the front seat, and the vehicle was subject to public scrutiny).

Similarly, the amount of restraint on Gonzalez's physical movement also suggests that a reasonable person would not equate it with formal arrest. The doors of the vehicle were unlocked, and the windows were partially open. Notably, Gonzalez was not handcuffed or otherwise restrained during the interview. *Cf. Chavira*, 614 F.3d at 134 (finding that defendant's freedom of movement was severely restrained where agents confiscated her birth certificate and state identification and handcuffed her to a chair during the interrogation). Although Gonzalez was briefly handcuffed earlier that morning, the interview occurred thirty to forty minutes after the handcuffs were removed. Unlike in *Cavazos*, where agents "ran into Cavazos's bedroom . . . and handcuffed him as he was stepping out of bed," 668 F.3d at 192, as the district court concluded, no evidence suggests "that Gonzalez was handcuffed for any reason other than his belligerency." Gonzalez "calmed down" after speaking with his stepfather, so agents removed the handcuffs. He had only been handcuffed for about twenty minutes, and agents had informed Gonzalez before and while he was handcuffed that he was not under arrest. So, the earlier, temporary handcuffing does not negate the lack of physical restraint of Gonzalez during the interview. *See United States v. Salinas*, 543 F. App'x 458, 465 (5th Cir. 2013) (per curiam) (explaining that "temporary detention by itself" does not "automatically rise to the level of custodial interrogation"); *see also Chavira,* 614 F.3d at 133.

Likewise, the agents' statements relating to Gonzalez's freedom to move or leave suggest that a reasonable person would not have found the restrictions equivalent to formal arrest. By asking—rather than forcing—Gonzalez to participate in the interview, the agents implied that he was free to terminate the questioning and leave the vehicle at any time. And before starting the interview, Piekenbrock reminded Gonzalez that he was not under arrest. As discussed, agents had also informed Gonzalez before and while he was briefly handcuffed that he was not under arrest. Although the agents' statements were not as clear as those in *Wright*, where agents explicitly told the defendant he was "free to leave," 777 F.3d at 771, a reasonable person would have interpreted the statements to mean that he was in fact free to leave. And, as the district court concluded, "the officers' actions in telling Gonzalez to remain seated in the chair after [the] handcuffs were removed" were not "instructions of confinement" or "language of confinement or arrest." *See Salinas*, 543 F. App'x at 465 ("Even if Salinas were not 'free to leave,' that does not mean that he was effectively under arrest for the purposes of *Miranda*."). Instead, the district court explained, "the officers were ensuring that Gonzalez had in fact calmed down and were cautioning him not to make sudden movements or again become belligerent." In accordance with our obligation to view the facts in the light most favorable to the Government, *see Cavazos*, 668 F.3d at 193, we agree with this interpretation of the agents' comments.

The nature of the questioning also weighs in favor of the interview being deemed non-custodial. Rather than engaging in hostile, accusatory questioning like the agents in *Chavira*, the agents here simply, as the district court put it, "asked Gonzalez to tell his side of the story and he agreed to do so." *Cf. Chavira*, 614 F.3d at 134 (finding that defendant's freedom of movement was severely restrained where agents questioned her in an increasingly accusatory manner for thirty to forty minutes). During their conversation, the agents' tone

remained "[m]easured" and "very professional." As in *Wright*, the content of the interview and the agents' "tone throughout[] highlights that the conversation was as much an opportunity taken by [Gonzalez] to tell his story to the officers as it was an opportunity taken by the officers to get information from [Gonzalez]." 777 F.3d at 777.

Finally, the length of the pre-warning interview—forty minutes—does not weigh heavily on either side of the scale. *See Harrell*, 894 F.2d at 124 n.1 (warning against "[o]verreliance upon the length" of the questioning, as it "injects a measure of hindsight into the analysis which we wish to avoid"). The interviews in *Wright* and *Cavazos*—two cases the parties relied upon—both lasted about an hour, and, as the *Wright* court explained, "the length of the questioning weighs in favor of finding that it was custodial." *Wright*, 777 F.3d at 777; *see also Cavazos*, 668 F.3d at 194. But we have previously rejected the "broad proposition" that "an hour-long [interview] constitutes a *per se* custodial interrogation." *Harrell*, 894 F.2d at 124 n.1. Here, the interview was shorter than an hour (about forty minutes) but not so brief as to weigh heavily in the opposite direction.

Gonzalez's argument leans heavily on what he asserts are similarities between the present case and *Cavazos*. But in addition to any factual distinctions, there is a critical difference: We are reviewing a district court's *denial* of a motion to suppress, meaning we must review the evidence in the light most favorable to the Government—not the defendant. *See United States v. Santiago,* 410 F.3d 193, 197 (5th Cir. 2005); *cf. Cavazos,* 668 F.3d at 191, 195 (reviewing the district court's grant of a motion to suppress and evaluating the record in the light most favorable to the defendant). Plus, in *Cavazos* we expressly noted that we were addressing "unique circumstances" and not making "categorical determinations." 668 F.3d at 195.

Considering all "the circumstances surrounding [Gonzalez's interview]," drawn from the record as seen in the light most favorable to the Government, we conclude that "a reasonable person [would] have felt he or she was at liberty to terminate the inter[view] and leave." *Id.* at 193 (internal quotation marks omitted). *Compare Wright*, 777 F.3d at 777 (affirming the district court's conclusion that the defendant was not in custody during a pre-*Miranda* interview where seventeen to nineteen law enforcement officers were in and around defendant's home executing a search warrant; officers repeatedly assured defendant that he was not under arrest and that he was free to leave; and defendant was not physically restrained during the hourlong interview, which took place about thirty feet from his home, in a car subject to public scrutiny, and the conversation was as much an opportunity taken by defendant to tell his story to officers as it was an opportunity taken by officers to get information from defendant), *and Salinas*, 543 F. App'x at 464–65 (finding that a reasonable person in defendant's position would not have considered himself under arrest where two federal marshals initially questioned him at his apartment complex; he remained subject to public scrutiny; and he was not restrained, even though one of the marshals retained defendant's cell phone and testified that defendant was not free to leave once he suspected defendant was lying), *with Cavazos*, 668 F.3d at 194 (affirming the district court's finding that a reasonable person would believe he was not "at liberty to terminate the interrogation and leave" where more than a dozen agents entered his home, handcuffed him as he stepped out of bed, separated him from his family, and two federal agents interrogated him for at least an hour—during which time they observed his restroom use and only allowed him to make a phone call in such a way that agents could listen to the conversation), *and Chavira*, 614 F.3d at 134 (finding that defendant's freedom of movement was severely restrained where agents confiscated her birth certificate and state identification; moved

her to a windowless, 14-by-10-foot secure room; handcuffed her to a chair; questioned her in an increasingly accusatory manner for thirty to forty minutes; and detained the minor in her care).

Because this "freedom-of-movement test identifies . . . a necessary . . . condition for *Miranda* custody," *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010), we conclude that Gonzalez was not in *Miranda* custody when he made his unwarned statements.

B

But even if Gonzalez's freedom of movement were so limited, the district court determined that the environment in which he was interviewed did not "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. And the district court did not err in reaching this conclusion.

About forty minutes after the handcuffs were removed, Gonzalez voluntarily agreed to speak with the agents and walked to Piekenbrock's vehicle. As the district court noted, "[n]o officer ordered Gonzalez to get into the vehicle, and no officer drew a gun." During the interview, Gonzalez sat "in the front passenger seat of [the] law-enforcement vehicle on [his] property and within 40 feet of his residence, with the vehicle's windows partly down, and without restraint." And the agents maintained a "respectful and calm" tone. Put simply, the environment was not inherently coercive; as the district court noted, "Gonzalez willingly agreed to speak with officers, agreed to get in the vehicle, never asked to leave, and never asked for a lawyer."

A reasonable person could certainly be "startl[ed] and intimidat[ed]" by eight to ten agents searching his or her home, but that's not enough to constitute station-house-level coercive pressure. *Wright*, 777 F.3d at 777 (recognizing "that the presence of 17 or 19 law enforcement officers in and around [defendant]'s home was startling and intimidating" but still concluding

that, based on "the totality of the circumstances," the interrogation was non-custodial). So, considering the totality of the circumstances, the environment where the in-car interview occurred did not "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Howes*, 565 U.S. at 509. Consistent with the district court's findings, there was "no evidence of coercive behavior or coercive questioning by the officers." As such, Gonzalez was not in *Miranda* custody during the pre-warning interview.

In sum, Gonzalez was not in *Miranda* custody when he was interviewed because a reasonable person in his position would not have viewed the situation as a restraint on his freedom of movement equal to a formal arrest, and the interview environment was not tantamount to a station house interrogation. Thus, we affirm the district court on this issue.

IV

But assuming *arguendo* that the pre-warning interview occurred while Gonzalez was in *Miranda* custody, we address Gonzalez's next argument: that his post-warning statements should be suppressed because the agents acted deliberately to circumvent the protections of *Miranda* by conducting both a pre-warning and post-warning interrogation. We find no error in the district court's denial of Gonzalez's motion to suppress and finding that the agents did not engage in a prohibited, two-step interrogation. So any error in admitting Gonzalez's pre-warning statements would be harmless.

Where a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Missouri v.*

*Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring in the judgment);[1] *see also, e.g.*, *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007). This forbidden, two-step strategy "involves an interrogator relying on the defendant's prewarning statement to obtain the postwarning statement used against [him] at trial, by confronting the defendant with [his] inadmissible prewarning statements and pushing [him] to acknowledge them." *United States v. Delgado-Arroyo*, 358 F. App'x 530, 532 (5th Cir. 2009) (per curiam) (cleaned up).[2]

If we determine that agents employed a calculated strategy to evade *Miranda* with the proscribed two-step interrogation, we must determine if they took curative measures "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert,* 542 U.S. at 622 (Kennedy, J., concurring in the judgment).[3] But, if we conclude that agents used no such tactic, the admissibility of the warned statements is "governed by the principles of *Elstad.*" *Id.*; *see also infra* Part IV(B) (discussing *Elstad*).

---

[1] *Seibert*'s holding is set forth "in Justice Kennedy's opinion concurring in the judgment." *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006).

[2] For example, in *Seibert*, "[t]he postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them. See App. 70 ('[Patrice], didn't you tell me that he was supposed to die in his sleep?')." *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment).

[3] "For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. . . . Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment) (internal citation omitted).

No. 19-50725

A

So, to start, we must determine whether agents used the two-step interrogation strategy *Seibert* prohibits. Gonzalez argues that the agents deliberately waited to give *Miranda* warnings until he had made an "incriminating" statement. True, "Piekenbrock's operational plan contemplated that Gonzalez would be interviewed by officers but not *Mirandized*," and that Gonzalez might "be arrested if firearms were found in his home." But, as the district court found, the "officers did not determine that Gonzalez would be arrested until after Gonzalez admitted to buying a revolver from the Aryan Brotherhood and after the questioning officers presented the facts and circumstances to a federal prosecutor for review." Gonzalez made incriminating statements about his impersonation scheme, but those were insufficient "to cause him to be arrested that day." And Piekenbrock testified that Gonzalez's statement about purchasing the revolver "changed things," ultimately leading the agent to *Mirandize* Gonzalez. So, rather than engaging in a two-step interrogation premised on deceit, the record suggests that agents merely responded to evidence—including Gonzalez's voluntary statements—acquired during execution of the search warrant and acted in accordance with legal counsel. Gonzalez offered no evidence to the contrary.

Plus, the circumstances, nature, and tone of the questioning do not suggest "that coercion or other improper tactics were used." *Nunez-Sanchez*, 478 F.3d at 668. Rather, after providing Gonzalez with *Miranda* warnings, the agents continued to speak with him in a "very professional" tone. And the record indicates that, as in *Lim*, "the agents did not act with aggressiveness or hostility," *Lim*, 897 F.3d at 692 (internal quotation marks omitted), which undercuts any argument that the agents confronted Gonzalez with his pre-warning statements and pushed him to acknowledge them.

No. 19-50725

Gonzalez contends that the post-*Miranda* questioning was "repetitive" and that agents obtained "no new information after the warning," thus showing a deliberate scheme to undermine *Miranda*. But even if agents questioned Gonzalez about the same subjects pre- and post-*Miranda*, that does not prove that they "confront[ed]" him with his earlier statements and pressured him to acknowledge them. *See Delgado-Arroyo*, 358 F. App'x at 532. Indeed, the record shows that agents did not "confront[]" Gonzalez "with the statements that had been made earlier"; Piekenbrock testified that there was no "discussion of the statements that were made" before Gonzalez was provided *Miranda* warnings. Thus, the district court did not err by determining that the agents did not employ the proscribed two-step strategy when interviewing Gonzalez.[4]

B

Because agents did not use the proscribed two-step strategy, the admissibility of the warned statements is "governed by the principles of *Elstad*." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). As the Supreme Court explained in *Elstad*, the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985). "In such circumstances," the Court explained, "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* "Under *Elstad*, the relevant inquiry

---

[4] Consequently, no curative measures were necessary. So although Gonzalez is correct that the agents did not employ curative measures after providing Gonzalez *Miranda* warnings, that is irrelevant here.

16

is whether, in fact, the second statement was also voluntarily made." *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (cleaned up).

"[I]n evaluating the voluntariness of [a suspect's] statements," "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Elstad*, 470 U.S. at 318. The Supreme Court has rejected a "presum[ption of] coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Id.* Rather, "[a] statement is involuntary if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are so offensive to a civilized system of justice that they must be condemned." *Lim*, 897 F.3d at 692 (cleaned up). And the Government has the burden to prove that Gonzalez voluntarily waived his *Miranda* rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

Here, the district court correctly determined "that Gonzalez's post-*Miranda* statements were voluntarily made" and noted that Gonzalez did not present any evidence otherwise. Gonzalez did not even argue in his opening appellate brief that his post-warning statements were constitutionally involuntary, so the argument is forfeited. *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (explaining that "[f]ailure adequately to brief an issue on appeal constitutes [forfeiture] of that argument" and finding that argument was forfeited where a party "fail[ed] to raise it in its opening brief"). And even if Gonzalez hadn't forfeited the argument, it

would fail.[5] We affirm the district court's denial of Gonzalez's motion to suppress his post-warning statements.[6]

*      *      *

For these reasons, we AFFIRM. And we DENY Gonzalez's motion for bail pending appeal as moot.

---

[5] As the district court emphasized, "Piekenbrock testified that Gonzalez stated he understood his rights and agreed to waive them and continue the interview." Plus, considering the totality of the circumstances of the interview and the agents' conduct, we conclude that Gonzalez's post-warning statements were voluntary rather than coerced.

[6] As discussed, the district court properly admitted Gonzalez's pre-warning statements. But even if the district court had erred, because Gonzalez's pre- and post-*Miranda* statements were substantively the same, any error in admitting Gonzalez's pre-*Miranda* statements was harmless. *Cf. United States v. Boche-Perez*, 755 F.3d 327, 342 (5th Cir. 2014).